# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF NORTH CAROLINA
# SOUTHERN DIVISION

| | |
|---|---|
| JIMMY EDWARDS, ROBERT HUNT and DOLORES HUNT, and CLIFFORD MCKELLAR, JR. and EMMA MCKELLAR on behalf of themselves and all others similarly situated, <br><br> PLAINTIFFS, <br><br> vs. <br><br> CSX CORPORATION, CSX TRANSPORTATION, INC., and CSX INTERMODAL TERMINALS, INC., <br><br> DEFENDANTS. | Case No. 7:18-cv-169 <br><br> **CLASS ACTION COMPLAINT** <br><br> **(JURY TRIAL DEMANDED)** |

Plaintiffs Jimmy Edwards, Robert Hunt and Dolores Hunt, and Clifford McKellar, Jr. and Emma McKellar by and through their undersigned counsel, on behalf of themselves and all other persons and entities similarly situated, allege:

## **PARTIES**

1. Plaintiff Jimmy Edwards ("Edwards") is the owner of real property located at 66 National Avenue, Lumberton, North Carolina, which was damaged by flooding after Hurricane Florence.

2. Plaintiffs Robert Hunt and Dolores Hunt (collectively, "Hunt") own real property located at 2404 Arnold St., Lumberton, North Carolina 28358 and 2405 Arnold St., Lumberton, North Carolina 28358, which were both damaged by flooding after Hurricane Florence.

3. Plaintiffs Clifford McKellar, Jr. and Emma McKellar (collectively, "McKellar") own real property located at 2410 Arnold St., Lumberton, North Carolina 28358 Arnold St., which was both damaged by flooding after Hurricane Florence.

4. CSX Corporation is a corporation organized and existing under the laws of the State of Virginia with a principal place of business at 500 Water Street (c-115), Jacksonville, Florida 32202. CSX Corporation is licensed to do business in North Carolina and maintains minimum contacts with the State of North Carolina to satisfy the due process clause of the United States Constitution.

5. CSX Transportation, Inc. is a corporation organized and existing under the laws of the State of Virginia with a principal place of business at 500 Water Street, Jacksonville, Florida 32202. CSX Transportation, Inc. is licensed to do business in North Carolina and maintains minimum contacts with the State of North Carolina to satisfy the due process clause of the United States Constitution.

6. CSX Intermodal Terminals, Inc. is a corporation organized and existing under the laws of the State of Virginia with a principal place of business at 550 Water Street, Jacksonville, Florida 32202. CSX Intermodal Terminals, Inc. is licensed to do business in North Carolina and maintains minimum contacts with the State of North Carolina to satisfy the due process clause of the United States Constitution.

**JURISDICTION AND VENUE**

7. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332 because the aggregate amount in controversy exceeds $5,000,000, exclusive of interest and cost, and because all Defendants are citizens of another State.

8. Prosecution and venue of this class action in this district is proper under 28 U.S.C. § 1391 because Defendants do business herein, many Plaintiffs and Class Members reside and do business herein, and the events or omissions giving rise to the claims asserted herein occurred in this district.

## FACTUAL ALLEGATIONS

9. On or about September 10, 2018, and for days thereafter following Hurricane Florence, the city of Lumberton experienced devastating flooding. Numerous homes and vehicles in South Lumberton and West Lumberton were damaged or destroyed by water which poured through a gap in city levees. This gap was created by a railway underpass owned by CXS Corporation, CSX Transportation, Inc., and CSX Intermodal Terminals, Inc. (collectively "CSX" or "Defendants"). The result was extensive flooding and damage to homes and businesses in Lumberton, North Carolina and displacement of hundreds of residents in what has been called "one of the poorest populations in what is arguably the least developed part of the state."[1]

10. Upon information and belief, CSX was aware that the underpass was a point of vulnerability for major flooding in Lumberton, ignored reports warning of the need for a permanent floodgate, and refused city officials' pleas for permission to build a temporary berm to protect against forecasted Hurricane Florence flooding.

11. CSX knew of the potential for catastrophic damages if the underpass was not protected by a floodgate. It was at this very site on the railroad's property that water from the Lumber River poured into Lumberton after Hurricane Matthew in October 2016 causing catastrophic flooding that displaced 1500 residents for months and killed at least one person.

---

[1] Doug Clark Bock, *Two Years After a Devastating Hurricane, A North Carolina Town is Again at the Center of the Flood,* The New Yorker, September 18, 2018, available at https://www.newyorker.com/news/dispatch/two-years-after-a-devastating-hurricane-a-north-carolina-town-is-again-at-the-center-of-the-flood, (last accessed September 22, 2018)

3

### A. A History of Vulnerability and Flooding Through the CSX Railway Underpass

12. In or around 1977, levee construction along the Lumber River was completed, though not to the design specifications dictated by the Soil Conservation Service of the USDA.

13. In particular, the CSX Railroad underpass at Interstate 95 was constructed at a lower elevation than the designs specified, and a ten-foot earthen dike that was to be constructed to mitigate potential flooding was never put in place.[2]

14. In May 2003, the decision to accredit the levee was called into question by the North Carolina Floodplain Mapping Program. It was determined in conversations with the Federal Emergency Management Agency ("FEMA"), that the levee was not considered to provide adequate protection from flooding because the planned closure of the levee had not been built. Sandbagging at the CSX Railroad underpass was determined insufficient, because it was not a closure device that was a structural part of the levee system as required by 44 C.F.R. 65.10(b)(2).[3]

15. In October 2016, Hurricane Matthew struck North Carolina, and the waters of Lumber River flooded through the CSX railway underpass, causing substantial damage to Lumberton and displacing more than 1,500 Lumberton residents.[4]

16. In May 2018, North Carolina Emergency Management and the North Carolina Department of Transportation released a report titled "Lumber Basin Flood Analysis and Mitigation Strategies Study," which concluded that a permanent solution, such as a floodgate at

---

[2] North Carolina Emergency Management and North Carolina Department of Transportation, *Lumber River Basin Flood Analysis and Mitigation Strategies Study*, May 2018, available at https://files.nc.gov/rebuildnc/documents/files/lumber_mitigation_report.pdf, (last accessed September 22, 2018).
[3] Id.
[4] Doug Clark Bock, *Two Years After a Devastating Hurricane, A North Carolina Town is Again at the Center of the Flood,* The New Yorker, September 18, 2018, available at https://www.newyorker.com/news/dispatch/two-years-after-a-devastating-hurricane-a-north-carolina-town-is-again-at-the-center-of-the-flood, (last accessed September 22, 2018);.

the CSX Railroad underpass, would reduce damage from floods equivalent to those caused by Hurricane Matthew by approximately 80%, saving about 2,000 buildings and $232.6 million.[5]

17. Despite an offer by North Carolina Emergency Management and the Golden LEAF Foundation to provide $3.5 million in funding, when Hurricane Florence hit, no floodgate had been built to bridge the gap in the levees created by the CSX railway underpass.[6]

18. Lumberton Mayor Bruce Davis stated that the delay in building the floodgate was a result of delays caused by CSX, stating "[t]he holdup is that we don't have permission from the railroad to get on that property and do anything[,]" as only the governor could override CSX and force them to participate in building a permanent floodgate.[7]

**B. CSX Inaction and Obstruction of Efforts to Prepare for Hurricane Florence**

19. In the weeks leading up to Hurricane Florence's landfall, CSX failed to attend meetings regarding flood mitigation.[8]

20. Early the week of September 10, 2018, Lumberton city officials requested permission from CSX to build a sandbag berm across the underpass to fill the gap in the levee system and help mitigate potential flooding.[9]

21. According to Davis, Lumberton city officials were told multiple times that CSX would consider anyone attempting to stem the flooding from the underpass to be a trespasser.[10]

---

[5] North Carolina Emergency Management and North Carolina Department of Transportation, *Lumber River Basin Flood Analysis and Mitigation Strategies Study*, May 2018, available at https://files.nc.gov/rebuildnc/documents/files/lumber_mitigation_report.pdf, (last accessed September 22, 2018); Phil McCausland, *Rail Company Blamed for Hurricane Florence Flooding in North Carolina Town*, NBC News, September 21, 2018, available at https://www.nbcnews.com/news/us-news/rail-company-blamed-hurricane-florence-flooding-north-carolina-town-n911526, (last accessed September 23, 2018).
[6] Phil McCausland, *Rail Company Blamed for Hurricane Florence Flooding in North Carolina Town, supra.*
[7] Id.
[8] Id.
[9] Chris D'Angelo and Dave Jamieson, *CSX Railroad Fought a North Carolina City's Desperate Attempt to Prevent Devastating Flooding*, September 20, 2018, available at https://www.huffingtonpost.com/entry/lumberton-north-carolina-flooding-florence-csx-railroad_us_5ba286a0e4b09e34df25f6f0, (last accessed September 23, 2018).
[10] Id.

5

22. Lumberton City Planner Brandon Love said CSX threatened to sue anyone who tried to place sandbags across the underpass.[11]

23. As Hurricane Florence came closer, Lumberton city leaders petitioned North Carolina Governor Roy Cooper to intervene and allow sandbags to be placed across the CSX railway underpass.[12]

24. On Friday September 14, 2018, Governor Cooper issued an emergency order greenlighting construction of the sandbag berm.[13]

25. Though a mix of volunteers, city officials, and National Guard members were able to construct a temporary berm and buy time for Lumberton residents, the berm broke around 2:00 p.m. on Sunday September 17, 2018.[14]

26. State Senator and Robeson County Republican Danny Britt faults CSX, stating "CSX has not been a good community partner," and that "[i]f we had the floodgate, we wouldn't have had any damage in West Lumberton."[15]

27. On Friday September 21, 2018, reports were projecting a second surge in flooding of the Lumber River.[16]

### C. Damage to Plaintiffs and Class Members

28. As of the time of this filing, much of Lumberton remains underwater.

---

[11] Id.
[12] Chris D'Angelo and Dave Jamieson, *CSX Railroad Fought a North Carolina City's Desperate Attempt to Prevent Devastating Flooding*, September 20, 2018, available at https://www.huffingtonpost.com/entry/lumberton-north-carolina-flooding-florence-csx-railroad_us_5ba286a0e4b09e34df25f6f0, (last accessed September 22, 2018).
[13] Id.
[14] Id.
[15] Colin Campbell, *Lumberton Didn't Fix a Big Weakness Before Florence. So Residents Tried a DIY Defense.* The News and Observer, September 19, 2018, available at https://www.newsobserver.com/news/politics-government/article218692775.html, (last accessed September 23, 2018).
[16] Michael Perchick, *Lumber River Expected to Crest for a Second Time Since Florence*, ABC News, September 21, 2018, available at https://abc11.com/lumber-river-expected-to-crest-for-the-second-time/4306504/, (last accessed September 23, 2018).

6

29. Due to the mandatory evacuations and extensive flooding, Plaintiffs and all others similarly situated have been devastated by the loss of homes and business.

30. Accordingly, this Class Action Complaint is filed on behalf of those persons (individuals and entities) seeking private (non-governmental) economic loss and property damages.

31. This Complaint asserts claims under federal common law and federal statutory law, seeking damages for the Classes defined in the Class Allegations section of this Complaint, including actual, compensatory, and punitive damages, arising from the flooding of the CSX railway underpass.

32. CSX could have prevented this catastrophe by using proper risk management practices, following industry standards, heeding the advice of experts, and responding to town requests for permission to construct temporary berms. However, CSX chose not to provide or allow for precautionary measures, and to save money and time at the expense of safety. Their cost-cutting measures were taken with willful, wanton, and reckless indifference to the economic interests, businesses, and property of Plaintiffs and Class Members described herein.

33. CSX made decisions impacting the safety of the health, welfare, and value of the people, businesses, and property of the Plaintiffs and Class Members in the direction of short-term gain, through reduced cost, rejecting adequate and responsible risk-analysis checks and balances to weigh cost and time versus risk and safety. The result was predictable in that the outcome mirrored the extensive flooding and damage that took place during Hurricane Matthew in 2016.

34. Moreover, because CSX's conduct endangered the health and safety of a large region and population, caused and increased the risk of serious injury and bodily harm, and

affected a financially vulnerable population, the degree of reprehensibility of CSX's conduct is at the highest level.

35. The flooding of the CSX railway underpass has caused, and continues to cause, devastating economic damage. For example, businesses have lost and continue to lose income; and property owners have suffered the loss, damage, and/or diminution of the value of their properties.

36. Plaintiffs Edwards and Hunt have suffered economic injury, damage, and/or losses as a result of the catastrophic flow of water through the CSX railway underpass and onto their properties and hundreds of other properties in West Lumberton and South Lumberton.

## CLASS ACTION ALLEGATIONS

**A.   Class Definitions and Exclusions**

37. Plaintiffs seek certification of the following Classes:

**Area Residents Class:**

All persons who own real property in Lumberton, North Carolina, and whose homes, vehicles or other real property suffered damage due to flooding from the CSX railway underpass after Hurricane Florence.

**Area Business Class:**

All persons who own a business in Lumberton, North Carolina, that lost income due to flooding from the CSX railway underpass after Hurricane Florence.

38. Excluded from the Classes are: (a) any Judge or Magistrate presiding over this action and members of their families; (b) CSX and any entity in which CSX has a controlling interest or which has a controlling interest in CSX and their legal representatives, assigns and successors of CSX; and (c) all persons who properly execute and file a timely request for exclusion from the Classes or are currently in litigation with CSX.

### A. Numerosity of the Class/Impracticability of Joinder — F.R.C.P. 23(a)(1)

39. The Classes consists of hundreds of individuals and businesses that have been economically damaged by the flooding of the CSX railway underpass, making joinder impracticable. Class members can be informed of the pendency of this action by print, Internet, and broadcast notice.

### B. Commonality — F.R.C.P. 23(a)(2).

40. Common questions of law and fact exist as to all members of the Classes. Because CSX's behavior here is governed by federal regulations, the Class Members will be subject to common questions of law.

41. Furthermore, the factual bases of CSX's conduct are common to all Class Members and represent a common thread of reckless conduct and decisions, gross negligence and willful, wanton, and reckless indifference for the rights of others, resulting in injury to all members of the Class. Each Class Member's claim arises from the same course of planning, decisions, and events, and each Class Member will make similar legal and factual arguments to prove CSX's outrageous, willful, reckless, wanton, and deplorable conduct and liability.

42. CSX's conduct presents a series of significant factual questions with common answers, including:

   a. Whether CSX negligently, outrageously, willfully, wantonly, and/or recklessly caused and/or contributed to the railway underpass flooding;

   b. Whether CSX knew or should have known of the risk of the railway underpass flooding; and

   c. Whether CSX's conduct in failing to work to build a permanent floodgate after Hurricane Matthew was outrageous, grossly negligent, willful, wanton, or reckless.

d. Whether CSX's conduct in failing to take temporary protective and preventative measures prior to the onset of Hurricane Florence was outrageous, grossly negligent, willful, wanton, or reckless.

e. Whether CSX's conduct in refusing to allow Lumberton city officials to take temporary protective and preventative measures prior to the onset of Hurricane Florence was outrageous, grossly negligent, willful, wanton, or reckless.

43. Common questions of fact also exist with respect to the punitive damages liability of CSX to the Class, including CSX's outrageous, grossly negligent, willful, reckless, and wanton conduct; the calculation of the amount of punitive damages that may be imposed upon each of the Defendants consistent with due process; intra-class equity with respect to the allocation and utilization of punitive damages; and the most practicable and most equitable allocation, disbursement, and utilization of such damages for punishment of CSX's wrongful conduct toward Plaintiffs, the Classes, and society, and in fulfillment of the deterrent policy and purpose of punitive damages.

### C. Typicality — F.R.C.P. 23(a)(3)

44. The claims in this Class Action Complaint are typical of the claims of the Classes in that they represent the various types of non-governmental economic losses and property damage caused by the flooding of the CSX railway underpass. Each Class Member's claim arises from the same course of planning, decisions, and events, and each Class Member will make similar legal and factual arguments to prove CSX's outrageous, grossly negligent, willful, reckless, and wanton conduct and liability.

### E. Adequacy of Representation — F.R.C.P. 23(a)(4)

45. Plaintiffs will fairly and adequately represent and protect the interests of the Classes. Plaintiffs have retained counsel with substantial experience in prosecuting mass tort and complex class actions. Plaintiffs and their counsel are committed to prosecuting this action

vigorously on behalf of the Classes and have the financial resources to do so. Neither Plaintiffs nor their counsel have interests adverse to those of the Class.

### D. Class Certification under F.R.C.P. 23(b)(3) — Predominance and Superiority

46. The common issues of fact and law presented in this action, including those specified above, predominate with respect to the claims of the Classes over any questions affecting only individual Class members. Fundamentally, all Plaintiffs' claims arise out of a single course of conduct by CSX that caused the flooding of the railway underpass. Although this is a single event, single location mass disaster that has affected, and will continue to affect many individuals and businesses, its wide-ranging effects can be traced back to one single root: a chain of decisions and actions made jointly and severally by a small group of actors. Plaintiffs will present common proof with respect to CSX's failure to take reasonable precautions or allow the city to do so — proof that is the same for each member of the Class.

47. Plaintiffs' proof of CSX's outrageous, grossly negligent, willful, reckless, and wanton conduct will involve the same cast of characters, events, discovery, documents, fact witnesses, and experts. Common questions of fact also predominate concerning the determination of the aggregate quantum of punitive damages, necessary to fulfill the punishment and deterrence goals of such damages.

48. Because CSX's behavior here is governed by federal regulations, the Class Members will be subject to common questions of law.

49. A class action is superior to the only other method available for the adjudication of CSX's outrageous, grossly negligent, willful, reckless, and wanton conduct — individual litigation and multiple trials. The repetitive individual litigation of CSX's conduct by all members of the Classes is inefficient, impracticable, economically infeasible, and potentially

unfair, particularly in light of the unique context of CSX's course of conduct and its unprecedented impact upon the Classes, the economy, and society.

50. It would be unduly burdensome on the courts to undergo the individual re-litigation of the same facts and legal issues in hundreds of cases. The consideration of common questions of fact and law via this class action will conserve judicial resources and promote a fair and consistent resolution of these claims.

## CLAIM I

## NEGLIGENCE

51. Plaintiffs reallege each and every allegation set forth in all preceding paragraphs as if fully restated here, in the claim for negligence under federal common law.

52. At all times material hereto, CSX were responsible for the operation and maintenance of the railway underpass near Interstate 95 in Lumberton, North Carolina.

53. At all times material hereto, CSX owed and breached duties of ordinary and reasonable care to Plaintiffs in connection with the operation and maintenance of the railway underpass, and additionally owed and breached duties to Plaintiffs and Class Members to guard against and/or prevent the risk of flooding through the CSX railway underpass.

54. Plaintiffs, as owners, lessors, lessees, and/or operators of real property or businesses at or near the CSX railway underpass in Lumberton, North Carolina were within an appreciable zone of risk and, as such, CSX were obligated to protect them.

55. CSX knew of the dangers associated with the break in the levies created by the CSX railway underpass and failed to take appropriate measures to prevent damage to Plaintiffs' and the Classes' properties and businesses.

56. CSX was under a duty to exercise reasonable care while operating and maintaining the railway underpass to ensure that it did not put nearby Lumberton residents and business owners at risk of catastrophic flooding.

57. CSX was under a duty to exercise reasonable care to ensure that its underpass did not create a risk of catastrophic flooding and damage to nearby residents and landowners.

58. CSX knew or should have known that the acts and omissions described herein could result in significant damage to Plaintiffs and the Classes.

59. CSX failed to exercise reasonable care while operating and maintaining the railway underpass and thereby breached duties owed to Plaintiffs and the Classes.

60. CSX failed to exercise reasonable care by not facilitating or participating in the building of a permanent floodgate after the damage caused by the CSX railway underpass flooding during Hurricane Matthew.

61. CSX failed to exercise reasonable care by not building or facilitating the building of a temporary berm prior to Hurricane Florence's landfall.

62. CSX failed to exercise reasonable care in refusing to allow Lumberton city officials to build a temporary berm to prevent flooding anticipated by Hurricane Florence.

63. CSX failed to exercise reasonable care in threatening Lumberton city officials with lawsuits should they attempt to build a temporary berm to prevent flooding anticipated by Hurricane Florence.

64. CSX failed to exercise reasonable care to ensure that adequate safeguards, protocols, procedures and resources would be readily available to prevent and/or mitigate the effects of flooding of the railway underpass, and thereby breached duties owed to Plaintiffs and the Classes.

13

65. In addition to the foregoing acts of negligence, Plaintiffs aver that the flooding of the CSX railway underpass was caused by the joint, several, and solidary negligence and fault of following non-exclusive particulars:

   a. Failing to build a permanent structure to breach the gap in the levee system caused by the railway underpass;

   b. Failing to build a permanent floodgate;

   c. Failing to adequately prepare for flooding in anticipation of Hurricane Florence;

   d. Acting in a careless and negligent manner without due regard for the safety of others;

   e. Failing to promulgate, implement and enforce rules and regulations pertaining to the safe operations of the railway underpass during times of flooding;

   f. Failing to take appropriate action to avoid or mitigate flooding of the railway underpass;

   g. Impeding city officials from taking steps to prevent and/or mitigate potential flooding;

   h. Failing to timely bring the flooding under control;

   i. Such other acts of negligence and omissions as will be shown at the trial of this matter.

66. Plaintiffs are entitled to a judgment finding CSX liable, and solitarily, to Plaintiffs for economic and property damages suffered as a result of CSX's negligence and awarding Plaintiffs adequate compensation therefor in amounts determined by the trier of fact.

67. The injuries to Plaintiffs and the Classes were also caused by and/or aggravated by the fact that CSX failed to take necessary actions to mitigate the danger associated with its operations.

68. As a direct and proximate result of CSX's negligence, Plaintiffs and the Classes have suffered a loss of business income, loss of the use and destruction of their homes, and damages associated and inconvenience sustained by the mandatory evacuations.

## CLAIM II

## GROSS NEGLIGENCE AND WILLFUL MISCONDUCT

69. Plaintiffs reallege each and every allegation set forth in all preceding paragraphs as if fully restated here, in this claim for relief for gross negligence and willful misconduct under federal common law.

70. CSX owed and breached duties of ordinary and reasonable care to Plaintiffs in connection with the maintenance and operation of the CSX railway underpass, and additionally owed and breached duties to Plaintiffs and the Classes to guard against and/or prevent the risk of the flooding of the CSX railway underpass.

71. CSX breached its legal duty to Plaintiffs and failed to exercise reasonable care and acted with reckless, willful, and wanton disregard in the negligent operation of the CSX railway underpass and the failure to adequately prepare for anticipated flooding.

72. CSX knew or should have known that its wanton, willful, and reckless misconduct would result in a disastrous and devastating flooding that would endanger the life and safety of the residents of Lumberton and cause damage to those affected by flooding of the CSX railway underpass.

73. CSX acted with gross negligence, willful misconduct, and reckless disregard for human life and the safety and health of the environment and Plaintiffs and the Classes by, *inter alia*, disregarding reports calling for construction of a permanent structure to bridge the gap in the levees caused by the CSX railway underpass.

74. CSX acted with gross negligence, willful misconduct, and reckless disregard for human life and the safety and health of the environment and Plaintiffs and the Classes by, *inter alia*, disregarding proper safety procedures; failing to ensure that that adequate safeguards, protocols, procedures and resources would be readily available to prevent and/or mitigate the effects of the flooding of the CSX railway underpass.

75. CSX acted with gross negligence, willful misconduct, and reckless disregard for human life and the safety and health of the environment and Plaintiffs by, *inter alia*, recklessly refusing to allow Lumberton city officials to take adequate measures to guard against anticipated flooding.

76. As a direct and proximate result of CSX's gross negligence, willful misconduct, and reckless disregard for human life and the safety and health of the environment and Plaintiffs, Plaintiffs and Classes have suffered a loss of and damages to homes and businesses, and damages associated and inconvenience sustained by the mandatory evacuations.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that the Court enter judgment in Plaintiffs' favor and against CSX, as follows:

1. certifying this action as a class action and appointing Plaintiffs' counsel to serve as Class Counsel;

2. awarding Plaintiffs and the members of the class actual damages, including compensatory and consequential damages, in an amount to be determined at trial;

3. awarding Plaintiffs and the members of the class exemplary or punitive damages;

4. awarding Plaintiffs and the members of the class pre-judgment and post-judgment interest;

5. awarding Plaintiffs and the members of the class such costs and disbursements as are incurred in prosecuting this action, including reasonable attorneys' and experts' fees; and,

6. granting Plaintiffs and the members of the class such other and further relief as this Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs demand a jury trial for any and all claims pled herein in which a jury trial is available by law.

Respectfully submitted, this the 24th day of September, 2018.

By:     */s/ Daniel K. Bryson*
            Daniel K. Bryson
            N.C. State Bar No. 15781
            Scott C. Harris
            N.C. State Bar No. 35328
            Matthew Lee:
            N.C. State Bar No. 35405
            WHITFIELD BRYSON & MASON, LLP
            900 West Morgan St.
            Raleigh, North Carolina 27603
            Telephone: 919-600-5000
            Fax: 919-600-5035
            Email: dan@wbmllp.com
            Email: scott@wbmllp.com
            Email: matt@wbmllp.com

            Gary E. Mason
            (to be admitted pro hac vice)
            Danielle L. Perry
            (to be admitted pro hac vice)
            WHITFIELD BRYSON & MASON, LLP
            5101 Wisconsin Ave., NW
            Suite 305
            Washington, DC 20016
            Telephone: 202-429-2290
            Email: gmason@wbmllp.com
            Email: dperry@wbmllp.com

            Joel R. Rhine
            N.C. State Bar No. 16028
            RHINE LAW FIRM, P.C.
            1612 Military Cutoff Road, Ste. 300
            Wilmington, NC 28403
            Tel: (910) 772-9960
            Fax: (910) 772-9062
            Email: jrr@rhinelawfirm.com

Gregory F. Coleman
GREG COLEMAN LAW PC
(to be admitted pro hac vice)
First Tennessee Plaza
800 S. Gay Street, Suite 1100
Knoxville, TN 37929
T: 865-247-0080
F: 865-522-0049
Email: greg@gregcolemanlaw.com