IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
SOUTHERN DIVISION
CONSOLIDATED ACTION

| | |
|---|---|
| JIMMY EDWARDS, ROBERT HUNT, DOLORES HUNT, CLIFFORD MCKELLAR, JR., and EMMA MCKELLAR, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>CSX TRANSPORTATION, INC.,<br><br>Defendant. | No. 7:18-CV-169-BO |
| ANTOINETTE MOORE, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>CSX TRANSPORTATION, INC.,<br><br>Defendant. | No. 7:18-CV-177-BO |
| WEST LUMBERTON BAPTIST CHURCH, CURRIE CHAINSAW, INC., C.J.M. VENTURES, INC., WILLIAM LOCKLEAR d/b/a STRICKLAND'S BARBERSHOP, TBL ENVIRONMENTAL LABORATORY, INC., SAMMY'S AUTO SALES, INC., LINDA SAMPSON, and ERIC CHAVIS, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>CSX TRANSPORTATION, INC.,<br><br>Defendant. | No. 7:18-CV-178-BO |

ORDER

This matter is before the Court on defendant's motions to dismiss plaintiffs' complaint and amended complaint. [DE 23, 35]. Defendant has also moved for leave to file excess pages [DE 40] and plaintiffs have moved to appoint lead counsel and a steering committee for the putative class [DE 43]. All of the motions are ripe for disposition. For the reasons that follow, defendant's first motion to dismiss [DE 23] is DENIED AS MOOT, defendant's second motion to dismiss [DE 35] is GRANTED, defendant's motion for leave to file excess pages [DE 40] is GRANTED, and plaintiffs' motion to appoint lead counsel and a steering committee [DE 43] is DENIED AS MOOT.

BACKGROUND

In October 2016, Hurricane Matthew swept through eastern North Carolina, causing the Lumber River to overflow its banks and flood parts of Lumberton. Two years later, Hurricane Florence hit the same region; again, the Lumber River overflowed and flooded parts of Lumberton.

In September and October 2018, plaintiffs—Lumberton residences and businesses who were affected by the flooding—filed three putative class actions against CSX Transportation, Inc. ("CSX"). In November 2018, CSX moved to dismiss all three complaints under Rule 12(b)(6) of the Federal Rules of Civil Procedure. [*See, e.g.*, DE 23]. In January 2019, the Court consolidated the three actions. [DE 28]. Plaintiffs filed an amended complaint the following month. [DE 29].

In the mid-1970s, a levee system was constructed along the banks of the Lumber River to protect the city of Lumberton from flooding. [DE 29, ¶¶ 21–22]. Predating the levee, however, is a railroad track that is now owned by CSX. *Id.* ¶ 21. The right-of-way on which the track sits, and which CSX also owns, was first granted by the North Carolina legislature in February 1855. *Id.* ¶ 31. Interstate 95, which sits primarily on an elevated berm that forms part of the levee system,

2

crosses both the CSX track and a parallel road, VFW Road, on an overpass. *Id.* ¶ 22. That overpass—I-95 above, the CSX track and VFW Road below—creates a gap in the Lumberton levee system. In fact, plaintiffs allege that the gap is "low enough to act as a drain or funnel, pulling in floodwaters that have collected on the wet, northwest side of I-95, through the gap, and into Lumberton." *Id.* ¶ 24.

Critical to plaintiffs' case is a 1978 "Tri-Party Agreement" that CSX's predecessor, Seaboard Coast Line ("Seaboard"), entered into with the City of Lumberton and Robeson County Drainage District No. 1 ("Drainage District"). *Id.* ¶¶ 53–54. The 1978 agreement gave the licensees—the City of Lumberton and the Drainage District—the right "to construct and maintain portions of a 6-foot, more or less, high (10-foot wide top with 3:1 side slopes) earthen dike on the easterly and westerly points of [CSX's] right of way." [DE 29-1, p. 2]. The agreement further provided that the "City shall also have the right and privilege of closing said dike across said track and the roadbed thereof ONLY in the event the City of Lumberton is in eminent [sic] danger of flood and the closing of said dike across [CSX's] property shall be subject to [CSX] being given at least 12 hours['] notice prior to such closing." *Id.* at 3. Plaintiffs further allege that "in this same time period, Seaboard also agreed to construction of a permanent floodgate at the gap." [DE 29, ¶ 69].

Plaintiffs ultimately allege that CSX breached the 1978 agreement, failed to take appropriate steps to mitigate the risk of flooding prior to Hurricane Matthew, failed to take appropriate steps after Hurricane Matthew to prevent future flooding, and prevented the City of Lumberton from constructing temporary barriers across the railroad tracks during both Hurricane Matthew and Hurricane Florence. Plaintiffs also allege that, in rebuilding its track bed with more

3

porous materials after Hurricane Matthew, CSX "worsened the risk and intensity of a future flood" through the gap. *Id.* ¶¶ 116–20.

Plaintiffs allege four causes of action: (1) a third-party beneficiary claim for breach of the 1978 agreement and the alleged separate agreement to permanently close the gap; (2) a tort claim based on CSX's alleged "duty to protect the public good"; (3) a claim for negligence and willful and wanton misconduct, stemming from CSX's alleged refusal to address the risk of flooding and to permit Lumberton officials to even temporarily sandbag the track; and (4) a claim for trespass and nuisance "arising from CSX's intentional diversion of the flow of surface waters," as a result of the rebuilding of the trackbed after Hurricane Matthew. *Id.* ¶¶ 234–79. Plaintiffs also seek certification of two putative classes of all persons and all businesses who "suffered damage to real or personal property" in Lumberton "due to floods through the gap at the intersection of the CSX railroad tracks and Interstate 95." *Id.* ¶ 200.

CSX has again moved to dismiss under Rule 12(b)(6). [DE 35]. CSX raises a number of arguments in response to plaintiffs' claims, but principally, CSX argues that (1) plaintiffs lack standing as third-party beneficiaries to enforce the 1978 agreement and no other agreement has been plausibly alleged and (2) plaintiffs' tort claims are preempted by the Interstate Commerce Commission Termination Act (ICCTA). [DE 36].

Plaintiffs have responded in opposition to the motion to dismiss. [DE 39]. CSX filed a reply and, in doing so, moved for leave to file excess pages. [DE 40, 41]. Plaintiffs have also moved to appoint lead counsel and a steering committee for their putative classes. [DE 43]. On July 9, 2019, a motions hearing was held before the undersigned in Elizabeth City, North Carolina. [DE 45].

4

DISCUSSION

At the outset, for good cause shown, CSX's motion for leave to file excess pages is granted. Additionally, because this action has been consolidated and an amended complaint has been filed since CSX's first motion to dismiss was filed, the first motion to dismiss is denied as moot.

CSX has moved to dismiss amended complaint for failure to state a claim upon which relief can be granted under Federal Rule of Civil Procedure 12(b)(6). When considering a motion to dismiss under Rule 12(b)(6), "the court should accept as true all well-pleaded allegations and should view the complaint in a light most favorable to the plaintiff." *Mylan Labs., Inc. v. Matkari*, 7 F.3d 1130, 1134 (4th Cir. 1993). A complaint must state a claim for relief that is facially plausible. *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged," as merely reciting the elements of a cause of action with the support of conclusory statements does not suffice. *Iqbal*, 556 U.S. at 678. The Court need not accept the plaintiff's legal conclusions drawn from the facts, nor need it accept unwarranted inferences, unreasonable conclusions, or arguments. *Philips v. Pitt County Mem. Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009).

**1. Plaintiffs' breach-of-contract claim must be dismissed because plaintiffs lack standing.**

Plaintiffs' first cause of action must be dismissed because the plaintiffs lack standing to assert a breach-of-contract claim as third-party beneficiaries. Plaintiffs attempt to assert a claim as third-party beneficiaries for breach of both the 1978 agreement and a separate agreement from around the "same time period" in which Seaboard, CSX's predecessor, allegedly agreed to itself construct a permanent solution to the flood risk posed by the gap at issue. In general, a contract can only be enforced by parties who are in privity of contract. "[T]o withstand a motion to dismiss

for failure to state a claim in a breach of contract action, a plaintiff's allegations must either show it was in privity of contract, or it is a direct beneficiary of the contract." *Lee Cycle Ctr., Inc. v. Wilson Cycle Ctr., Inc.*, 143 N.C. App. 1, 8, 545 S.E.2d 745, 750, *aff'd*, 354 N.C. 565, 556 S.E.2d 293 (N.C. 2001). To assert a claim as a third-party beneficiary, a plaintiff must "show (1) that a contract exists between two persons or entities; (2) that the contract is valid and enforceable; and (3) that the contract was executed for the direct, and not incidental, benefit of the plaintiff." *Holshouser v. Shaner Hotel Grp. Props., One Ltd. P'ship*, 134 N.C. App. 391, 399–400, 518 S.E.2d 17, 25 (1999), *aff'd*, 351 N.C. 330, 524 S.E.2d 568 (N.C. 2000). To be a direct beneficiary, the contracting parties must have specifically "intended to confer a legally enforceable benefit on that person," as it is not enough to simply receive a foreseeable benefit. *Id.* When a third party seeks to enforce a contract, "the contract must be construed strictly against the party seeking enforcement." *Id.* at 400 (quoting *Chemical Realty Corp. v. Home Fed'l Savings & Loan*, 84 N.C. App. 27, 34, 351 S.E.2d 786, 791 (N.C. 1987)). To determine whether the contracting parties intended to directly benefit a third party, courts must consider the surrounding circumstances and language of the contract. *Revels v. Miss Am. Org.*, 182 N.C. App. 334, 336, 641 S.E.2d 721, 723 (N.C. Ct. App. 2007).

The Court finds that plaintiffs have not alleged sufficient facts to demonstrate that they were the direct, intended beneficiaries of the 1978 agreement or any other alleged agreement between CSX (or its predecessor, Seaboard) and the City of Lumberton or the Drainage District. Put simply, plaintiffs have not established that the 1978 public works agreement was executed for the *direct* benefit of Lumberton residents and businesses. Certainly Lumberton's residents and businesses were incidental beneficiaries. But in effect, what plaintiffs seek to do in this case is to convert a 41-year-old public-works agreement into a contract that any Lumberton resident or

6

business owner can sue in federal court to enforce. The Supreme Court of North Carolina's decision in *Matternes v. City of Winston-Salem*, 286 N.C. 1, 209 S.E.2d 481 (N.C. 1974), is instructive. In *Matternes*, the court quoted then-Chief Justice Benjamin N. Cardozo of the New York Court of Appeals, who wrote that

> In a broad sense it is true that every city contract, not improvident or wasteful, is for the benefit of the public. More than this, however, must be shown to give a right of action to a member of the public not formally a party. The benefit, as it is sometimes said, must be one that is not merely incidental and secondary. . . . It must be primary and immediate in such a sense and to such a degree as to bespeak the assumption of a duty to make reparation directly to the individual members of the public if the benefit is lost.

209 S.E.2d at 488 (quoting *H.R. Moch Co. v. Rensselaer Water Co.*, 247 N.Y. 160, 164, 159 N.E. 896, 897 (N.Y. 1928)). The *Matternes* court then affirmed the lower court's summary judgment in favor of the defendant city, holding that the a driver who sustained injuries on the state's highway system could not sue to enforce the city's contract with the board of transportation. *Id.* at 489.

As in *Matternes*, plaintiffs in this action have not alleged sufficient facts to establish that the contracting parties in 1978 intended to confer a *direct* benefit on them, as residents of Lumberton, such that they can now sue to enforce the agreement four decades later. The 1978 agreement did not mention the public or any specific areas of Lumberton. There is no allegation of "active and direct dealings" between these plaintiffs and the contracting parties, or even between the public and the contracting parties. *See Hospira Inc. v. Alphagary Corp.*, 194 N.C. App. 695, 703, 671 S.E.2d 7, 13 (N.C. Ct. App. 2009) (holding that the fact that the third party "may have coordinated the agreement" did not "without demonstration of [the third party's] 'active and direct' involvement," establish that the third party was an intended, direct beneficiary). This is also true of the alleged separate agreement that plaintiffs believe obligated CSX itself to build a permanent barrier. Even if the Court were to accept that plaintiffs have plausibly alleged the existence of a

7

second contract, and taking as true the existence of a second contract, plaintiffs certainly have not plausibly alleged that they were the *direct* beneficiaries of that second contract. As such, plaintiffs have not satisfied the third prong of the *Holshouser* test for third-party beneficiary status, and therefore lack standing to assert breach of contract claims against CSX. Plaintiffs' breach of contract claim must be dismissed.

## 2. Plaintiffs' tort claims are preempted by the ICCTA and must be dismissed.

Plaintiffs' remaining causes of action must be dismissed because the claims are preempted by the ICCTA. Preemption, which is a product of the Supremacy Clause in Article VI of the Constitution, "occurs when Congress, in enacting a federal statute, expresses a clear intent to preempt state law." *La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 368 (1986). Railroads are subject to Congress's regulatory authority under the Commerce Clause. *See, e.g., Pittsburgh & Lake Erie R.R. Co. v. Ry. Labor Execs. Ass'n*, 491 U.S. 490, 510 (1989); *Houston, E. & W. Tex. Ry. v. United States*, 234 U.S. 342, 450–52 (1914). The Supreme Court has also long recognized Congress's preemptive authority to regulate railroads. *See, e.g., Colorado v. United States*, 271 U.S. 153, 165–66 (1926) (holding that the Interstate Commerce Commission's abandonment authority was plenary and exclusive); *Transit Comm'n v. United States*, 289 U.S. 121, 127–28 (1933) (holding that the Interstate Commerce Commission's authority over interstate rail construction was exclusive). State tort claims are a form of state regulation to which federal preemption applies. *Cipollone v. Liggett Grp., Inc.*, 505 U.S. 504, 521–22 (1992).

In 1887, Congress enacted the Interstate Commerce Act, which has been recognized as "among the most pervasive and comprehensive of federal regulatory schemes." *City of Auburn v. United States*, 154 F.3d 1025, 1029 (9th Cir. 1998). In 1995, Congress enacted the ICCTA, 49 U.S.C. §§ 10101, *et seq.*, expanding federal regulatory authority over railroads and expressly

8

preempting state rail regulations. Congress also established the Surface Transportation Board (STB) as an agency within the U.S. Department of Transportation, empowering the STB to regulate all aspects of railroad operations. *See* 49 U.S.C. §§ 701(a), 702. The STB was given exclusive jurisdiction over:

> (1) transportation by rail carriers, and the remedies provided in this part with respect to rates, classifications, rules (including car service, interchange, and other operating rules), practices, routes, services, and facilities of such carriers; and
>
> (2) the construction, acquisition, operation, abandonment, or discontinuance of spur, industrial, team, switching, or side tracks, or facilities, even if the tracks are located, or intended to be located, entirely in one State . . . .

49 U.S.C. § 10501(b). In the same subsection, Congress established that STB's jurisdiction "preempt[s] the remedies provided under Federal or State law." *Id.*

The Court finds that plaintiffs' tort claims, which all assert that CSX was negligent or breached some duty in designing, constructing, operating, or maintaining its railroad tracks, are preempted by the ICCTA.[1] Plaintiffs allege that CSX should have installed a permanent barrier across its tracks, should have rebuilt its trackbed after Hurricane Matthew with a less-porous material, and should have submitted to Lumberton authorities and allowed temporary barriers to be built across its tracks. These claims are inseparable from the duties to design, construct, operate, and maintain railroads that the STB imposes on CSX. Particularly instructive is the Eastern District of Louisiana's decision in *In re Katrina Canal Breaches Consol. Litig.*, No. 07-4551, 2009 WL 224072 (E.D. La. Jan. 26, 2009). The case, which followed Hurricane Katrina, involved similar claims of state-law negligence in CSX's design, construction, and maintenance of its tracks,

---

[1] Plaintiffs' breach-of-contract claim, however, would not be preempted by the ICCTA. When a railroad enters into a voluntary agreement, and then breaches that agreement, the counterparty can sue to enforce the agreement without being categorically barred by 49 U.S.C. § 10501(b)'s preemption provision. *Township of Woodbridge, N.J. v. Consolidated Rail Corp., Inc.*, 5 S.T.B. 336, 2000 WL 1771044, at *4 (S.T.B. Nov. 28, 2000).

9

including in the way the tracks intersected with the levee system in New Orleans. The *In re Katrina* court concluded that "[t]he application of state law negligence principles to assess and evaluate the suitability of the design and construction of a railroad crossing, railroad tracks, and roadbed for railroad tracks qualifies as an attempt at state law 'regulation' in respect to rail transportation." 2009 WL 224072, at *5. The court thus concluded that the state-law tort claims were preempted by the ICCTA.

Plaintiffs' state-law tort claims in this case suffer from the same fatal defects as the claims in the *In re Katrina* litigation: the claims are integrally related to designing, constructing, operating, and maintaining railroad tracks and all of those regulatory duties are given exclusively to the STB. Plaintiffs' nuisance claim involves CSX's decision to rebuild its trackbed after Hurricane Matthew with a more porous material than plaintiffs would have liked, but plaintiffs cannot use state tort law to require CSX to build with certain materials and not others. Only the STB can impose such a duty on CSX. Plaintiffs' second and third causes of action stem from CSX's refusal to build a permanent barrier across its track and refusal to permit Lumberton to build temporary or permanent barriers across the track. But, again, only the STB can require CSX to design, construct, or maintain its tracks in a particular way. Other courts have consistently found analogous tort claims to be preempted. *See, e.g., Pere Marquette Hotel Partners, L.L.C. v. United States*, No. 09-5921, 2010 WL 925297, at *4 (E.D. La. Mar. 10, 2010) (finding that tort claims challenging the construction of a railroad crossing at a canal's "flood protection structures" were preempted); *see also Waubay Lake Farmers Ass'n v. BNSF Ry. Co.*, No. 12-4179-RAL, 2014 WL 4287086, at *7 (D.S.D. Aug. 28, 2014) (finding that claims alleging a railroad had failed to upgrade its under-track drainage culvert, leading to flooding of downstream land, were preempted).

Plaintiffs' claims would not have only an incidental impact on CSX's railway operations in Lumberton. Rather, the tort claims are inextricable from CSX's responsibilities to design, construct, and maintain its tracks in conformity with STB requirements. Building temporary or permanent barriers across CSX's tracks, or altering the composition of the trackbed, would not have merely a "remote or incidental impact on rail transportation," *Norfolk S. Ry. Co. v. City of Alexandria*, 608 F.3d 150, 157–58 (4th Cir. 2010) (citing *PCS Phosphate Co. v. Norfolk S. Corp.*, 559 F.3d 212, 218 (4th Cir. 2009)); the impact would be immediate and direct. Plaintiffs' reliance on the Tenth Circuit's decision in *Emerson v. Kansas City S. Ry. Co.*, 503 F.3d 1126 (10th Cir. 2007), is unpersuasive. In *Emerson*, the Tenth Circuit held that the plaintiffs' tort claims stemming from a railroad's disposal of old railroad ties, which caused flooding on plaintiffs' adjoining property, were not preempted. But *Emerson* dealt with railroad acts that were much further removed from the operation of rail transportation than the acts—really, the omissions—at issue in this case. Indeed, the *Emerson* court concluded that the dumping of railroad ties was a "possibly tortious act[] committed by a landowner who happens to be a railroad company," while in this case, CSX is sued for acts and omissions taken in its capacity as a railroad company, not simply a landowner. Plaintiffs' tort claims squarely implicate questions of railroad design, construction, operation, and maintenance that Congress has reserved for the STB. The claims are preempted and must be dismissed.

In sum, all four of plaintiffs' causes of action in the amended complaint must be dismissed. Plaintiffs have not alleged sufficient facts to establish that they were direct, intended third-party beneficiaries of the 1978 Tri-Party Agreement or any other contract between CSX, the City of Lumberton, or the Drainage District. Thus, plaintiffs lack standing to enforce the 1978 agreement or any other alleged contract. Plaintiffs' tort causes of action all assert that CSX acted improperly

11

in designing, constructing, operating, or maintaining its railroad tracks and, as such, those tort causes of action are preempted by the ICCTA. Plaintiffs' amended cause of action must, therefore, be dismissed. Given the Court's conclusion that plaintiffs' amended complaint must be dismissed, plaintiffs' motion to appoint lead counsel and a steering committee is denied as moot.

## CONCLUSION

For the above reasons, defendant's first motion to dismiss [DE 23] is DENIED AS MOOT, defendant's second motion to dismiss [DE 35] is GRANTED, defendant's motion for leave to file excess pages [DE 40] is GRANTED, and plaintiffs' motion to appoint lead counsel and a steering committee [DE 43] is DENIED AS MOOT. Plaintiffs' amended complaint is DISMISSED. The Clerk is DIRECTED to close the case.

SO ORDERED, this 14 day of July, 2019.

*Terrence W. Boyle*
TERRENCE W. BOYLE
CHIEF UNITED STATES DISTRICT JUDGE