IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
SOUTHERN DIVISION
CONSOLIDATED ACTION

| | | |
|---|---|---|
| JIMMY EDWARDS, ROBERT HUNT, DOLORES HUNT, CLIFFORD MCKELLAR, JR., and EMMA MCKELLAR, on behalf of themselves and all others similarly situated, | ) ) ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | No. 7:18-CV-169-BO |
| CSX TRANSPORTATION, INC., | ) ) ) | |
| Defendant. | ) | |
| | | |
| WEST LUMBERTON BAPTIST CHURCH, CURRIE CHAIN SAW, INC., C.J.M. VENTURES, INC., WILLIAM LOCKLEAR d/b/a STRICKLAND'S BARBERSHOP, TBL ENVIRONMENTAL LABORATORY, INC., SAMMY'S AUTO SALES, INC., and ERIC CHAVIS, individually and on behalf of all others similarly situated, | ) ) ) ) ) ) ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | No. 7:18-CV-178-BO |
| CSX TRANSPORTATION, INC., | ) ) ) | |
| Defendant. | ) | |

ORDER

This consolidated action is before the Court on defendant CSX Transportation's motion for summary judgment pursuant to Fed. R. Civ. P. 56. Plaintiffs have responded, defendant has replied, and the motion is ripe for ruling. For the reasons that follow, defendant's motion for summary judgment is granted.

## BACKGROUND

The parties are well-familiar with the factual and procedural background of this consolidated action, and the Court provides only a summary here. In January 2019, the Court consolidated three putative class actions which alleged claims against CSX Transportation ("CSX") arising from flooding in and around the City of Lumberton, North Carolina as a result of Hurricanes Matthew and Florence. This Court dismissed plaintiffs' amended complaint on CSX's motion. Plaintiffs appealed, and the court of appeals affirmed this Court's dismissal of plaintiffs' tort claims but reversed its dismissal of plaintiffs' single breach of contract claim. [DE 58].

Following remand, CSX answered the amended complaint and the parties engaged in a period of discovery.[1] CSX then filed the instant motion for summary judgment on plaintiffs' remaining breach of contract claim and plaintiffs moved to certify the Rule 23 class. The Court subsequently granted CSX's motion to stay or postpone class certification proceedings pending its resolution of CSX's motion for summary judgment.

## DISCUSSION

A motion for summary judgment may not be granted unless there are no genuine issues of material fact for trial and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If that burden has been met, the non-moving party must then come forward and establish the specific material facts in dispute

---

[1] On September 8, 2022, plaintiffs Antoinette Moore and Linda Sampson stipulated to the dismissal of their claims against defendant, and the stipulation was filed only in the lead case. The Court has corrected the caption to reflect the dismissal by plaintiffs Moore and Sampson of their claims. The Clerk is DIRECTED to file the stipulation as of the date of its filing in the lead case in No. 7:18-CV-177-BO and 7:18-CV-178-BO. The Clerk is further DIRECTED to close No. 7:18-CV-177-BO pursuant to the stipulation of dismissal.

2

to survive summary judgment. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 588 (1986). In determining whether a genuine issue of material fact exists for trial, a trial court views the evidence and the inferences in the light most favorable to the nonmoving party. *Scott v. Harris*, 550 U.S. 372, 378 (2007). However, "[t]he mere existence of a scintilla of evidence" in support of the nonmoving party's position is not sufficient to defeat a motion for summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). "A dispute is genuine if a reasonable jury could return a verdict for the nonmoving party. . . . and [a] fact is material if it might affect the outcome of the suit under the governing law." *Libertarian Party of Virginia v. Judd*, 718 F.3d 308, 313 (4th Cir. 2013) (internal quotations and citations omitted). Speculative or conclusory allegations will not suffice. *Thompson v. Potomac Elec. Power Co.*, 312 F.3d 645, 649 (4th Cir. 2002).

The following facts are undisputed, unless otherwise noted. [DE 138, 142]. The Lumber River flows through the City of Lumberton, North Carolina ("the City" or "Lumberton"), from northwest to southeast. Neighborhoods on the north and east side of Lumberton are on somewhat elevated terrain, while neighborhoods on the south and west sides are in low-lying areas. A levee system was constructed from approximately 1975 to 1977 to address flooding caused by the Lumber River in the southern part of Lumberton.

A rail line operated by CSX and its predecessors runs parallel to the Lumber River, with Interstate 95 crossing over both the rail line and the river at a particular point. In June 1978, CSX's predecessor, the Seaboard Coast Line Railroad Company ("Seaboard"), the City, and the Robeson County Drainage District No. 1 ("Drainage District") entered into an agreement which has been referred to as the Tri-Party Agreement ("TPA"). The TPA states that, for consideration of one dollar, Seaboard granted the City and the Drainage District a license to construct and maintain an

3

earthen dike, according to specifications, at or near Lumberton, specifically 760 feet southeastwardly from Milepost SE-295, and adjacent to Seaboard's railroad tracks. [DE 127-1]. The TPA gave the City the "right and privilege" to close "said dike across said track" only in the event of imminent danger of flooding. TPA ¶ 8(a). Seaboard was required to be given a minimum of twelve hours' notice prior to the City closing the dike. *Id.* The City agreed that it would open the dike once the flooding had receded and that all expenses incident to the closing of the dike would be borne by the City. *Id.* ¶ 8(b). None of the plaintiffs is a party to the TPA nor were they involved in the formation, negotiation, or execution of the TPA. Plaintiffs were not consulted regarding the terms or existence of the TPA. No plaintiff in a residential home owned their property at the time of the execution of the TPA.

CSX's rail line through Lumberton is part of the U.S. Military's Strategic Rail Corridor Network, which allows the Department of Defense to access rail infrastructure in the event of military and national defense emergencies. The U.S. Military thus monitors CSX's rail line through Lumberton and has influence over CSX's decisions to close the line.

Hurricanes Matthew and Florence struck in 2016 and 2018, respectively, and caused the Lumber River, which divides the City, to overflow its banks and flood portions of Lumberton. At the times of these hurricanes, the City had not constructed the dike contemplated by the TPA.

**1. Implied preemption bars plaintiffs' contract claim.**

CSX argues first that plaintiffs' breach of contract claim is impliedly preempted by the Interstate Commerce Commission Termination Act, 49 U.S.C. § 10101, *et seq.* ("ICCTA"). The court of appeals has determined that plaintiffs' breach of contract claim is not *express*ly preempted by ICCTA, but that it "might still be impliedly preempted," leaving the issue open for CSX to raise on remand. *Edwards v. CSX Transportation, Inc.*, 983 F.3d 112, 121 n. 11 (4th Cir. 2020).

4

"[T]he generally accepted test for ICCTA implied or conflict preemption [asks]: does the enforcement action unreasonably interfere with rail transportation?" *PCS Phosphate Co. v. Norfolk S. Corp.*, 559 F.3d 212, 220-21 (4th Cir. 2009) (cleaned up, citation omitted). In examining whether plaintiffs' tort claims were expressly preempted by ICCTA, the Fourth Circuit held that it was "hard to view [plaintiffs'] claims as anything other than direct attempts to 'regulate' railroading." *Edwards*, 983 F.3d at 122. This holding applies equally to plaintiffs' TPA contract claim and is further supported by the undisputed record evidence.

First, the plain language of the TPA expressly confers on the City "the right and privilege of closing" the dike which the City was permitted to build adjacent to CSX's rail track with proper notice to the railroad, resulting in the closure of the rail line and any rail activities. The City is further provided with the unfettered discretion to determine when the rail tracks can be reopened and CSX can thus resume its business. The TPA permits the City to interfere with rail transportation, and the question is thus whether this interference is unreasonable. Whether interference is unreasonable "requires a factual assessment of the effect of providing the claimed remedy." *PCS Phosphate*, 559 F.3d at 221.

In some instances, a voluntary agreement entered into by a rail carrier may reflect "the carrier's own determination and admission that the agreement[] would not unreasonably interfere with interstate commerce." *The Twp. of Woodbridge, NJ, et al.*, 5 S.T.B. 336 (2000). However, in this case, the language of the TPA implicates "conduct which is clearly encompassed by the plain language of [ICCTA]." *Edwards*, 983 F.3d at 123. The TPA permits the City to at certain times control the operation of the subject rail line and CSX's routes and services in and through Lumberton; each of those activities has been designated as falling within the exclusive jurisdiction of the Surface Transportation Board provided by ICCTA. 49 U.S.C. § 10501(b).

5

CSX's evidence supports the conclusion that the TPA unreasonably interferes with rail transportation. CSX's Wilmington Subdivision consists of approximately 120 miles of track which runs through Lumberton. [DE 127-10] Dilday Decl. ¶ 5. There are approximately twelve to thirteen trains moving commodities and shipments across the Wilmington Subdivision per day, and the Wilmington Subdivision is further critical to the movement of emergency supplies and hazardous materials from the Port of Wilmington, North Carolina. *Id.* ¶¶ 8-9; *see also* [DE 127-9] Johnson Depo. at 81; [DE 127-11] Dillard Depo. At 156-57. Closure of the Wilmington Subdivision track at Lumberton would result in "considerable disruption," including delays and train traffic diversion resulting in congestion and additional delays. Dilday Decl. ¶ 11. Finally, the United States military has influence over any closure decisions that would impact the Wilmington Subdivision due to its inclusion in STRACNET. *Id.* ¶ 13.

Plaintiffs have not proffered evidence which would create a genuine issue of material fact as to whether the TPA unreasonably interferes with rail transportation. Although plaintiffs argue about past conduct, CSX's failure to terminate the TPA, and the fact that Seaboard drafted the TPA, none of those arguments create a material issue as to whether any interference with the railroad as a result of the TPA would be reasonable.

Plaintiffs contend that this is a voluntary agreement between sophisticated parties, and that there is no implied preemption by ICCTA. *See PCS Phosphate*, 559 F.3d at 221 ("market actors have incentives to enter into efficient arrangements."). The Court notes important distinctions between this case and other cases which have determined that a voluntary agreement is not impliedly preempted by ICCTA. First, the TPA was entered into prior to the enactment of ICCTA. *See CSX Transportation, Inc. v. City of Sebree, Kentucky*, 924 F.3d 276, 286 (6th Cir. 2019). Second, this is not a contract between private actors; rather, the City of Lumberton and the

6

Drainage District entered into the TPA for the benefit of their citizens and residents. *See Union Pac. R.R. Co. v. City of Palestine*, 517 F. Supp. 3d 609, 631 (E.D. Tex. 2021). Third, it is the law of this case is that "closing an otherwise open rail line" is something "only a railroad can do" and is "conduct ... clearly encompassed by the plain language of [ICCTA]." *Edwards*, 983 F.3d at 123. Recognizing that the test for express preemption does not ask specifically whether there is unreasonable interference with the railroad, as is required for implied preemption, the Fourth Circuit's holding in this case is nonetheless instructive. CSX has presented evidence of both economic and logistical burdens, which plaintiffs have not meaningfully rebutted. *See Union Pac. R.R. Co. v. City of Palestine, Texas*, 41 F.4th 696, 706 (5th Cir. 2022) (noting economic coupled with logistical burden is sufficient evidence of unreasonable interference to find implied preemption of a contract). The Court holds that summary judgment in CSX's favor is appropriate on the basis of implied preemption.

**2. Plaintiffs are not third-party beneficiaries to the TPA.**

The summary judgment record further does not support a genuine issue of material fact as to whether plaintiffs are third-party beneficiaries of the TPA. "In North Carolina, a third party can sue for breach of a contract if he can show that: (1) the contract exists; (2) the contract is valid and enforceable; and (3) the contracting parties 'intended primarily and directly to benefit him or the class of persons to which he belongs.'" *Edwards*, 983 F.3d at 117 (quoting *DeMent v. Nationwide Mut. Ins. Co.*, 142 N.C.App. 598, 544 S.E.2d 797, 801 (2001)). Only the third element is at issue in this case.

To be a direct beneficiary, the contracting parties must have specifically "intended to confer a legally enforceable benefit on that person," as it is not enough to simply receive a foreseeable benefit. *Holshouser v. Shaner Hotel Grp. Props., One Ltd. P'ship*, 134 N.C. App. 391,

7

399–400 (1999); *see also Edwards*, 983 F.3d at 119 ("Citizens cannot ordinarily sue for breach of a city contract; but if it's clear that the parties intended to benefit them specifically and directly, they can."). To determine whether the contracting parties intended to directly benefit a third party, courts must consider the surrounding circumstances and language of the contract. *Revels v. Miss Am. Org.*, 182 N.C. App. 334, 336 (2007). Courts require evidence of "active and direct dealings" between the plaintiff and the parties to the contract before conferring third-party beneficiary status. *Hospira Inc. v. Alphagary Corp.*, 194 N.C. App. 695, 703 (2009). When a third party seeks to enforce a contract, "the contract must be construed strictly against the party seeking enforcement." *Holshouser*, 134 N.C. App. at 400 (quoting *Chemical Realty Corp. v. Home Fed'l Savings & Loan*, 84 N.C. App. 27, 34 (1987)).

It is undisputed that the TPA does not mention plaintiffs, their proposed class, or any community members generally. Plaintiffs have further failed to create a genuine issue of material fact as to whether there were active and direct dealings between the proposed third-party beneficiaries and the parties to the TPA. *See Edwards*, 983 F.3d at 119 (noting that "A lack of evidence of 'active and direct dealings' might ultimately sink [plaintiffs'] third-party-beneficiary claim).

It is undisputed that none of the named plaintiffs had any dealings with any party to the TPA about the agreement, including consultation, formation of the TPA, negotiation of the TPA's terms, or execution of the TPA. The circumstances surrounding the TPA also do not reveal any active and direct dealings between plaintiffs or any community members and the parties to the TPA. Moreover, to demonstrate third-party beneficiary status, a party must show that all of the parties to the contract intended to directly and primarily benefit him. *DeMent*, 142 N.C. App. at 604. Thus, even if plaintiffs' evidence raises a genuine issue of material fact as to the intent of the

8

City and the Drainage District, plaintiffs have failed to demonstrate that there is a genuine issue of fact as to whether Seaboard intended plaintiffs or the class of people to which they belong to directly and primarily benefit from the TPA.

Plaintiffs rely on a July 14, 1978, letter from Seaboard regarding the TPA. [DE 139-17]. The letter references the application by the City and the Drainage District to construct an earthen dike "to protect the City of Lumberton from flooding of Lumber River during a 100-year frequency only." *Id.* That Seaboard recognized that the City and Drainage District requested to construct a dike "to protect the City of Lumberton" falls far short of evidence that *Seaboard* intended to benefit the citizens and residents of southern Lumberton when it entered into the TPA sufficiently to confer third-party beneficiary status.

### 3. Plaintiffs' contract claim fails.

Finally, plaintiffs' contract claim fails on the merits. The TPA provides the City and the Drainage District with the right to build an earthen dike on both sides of CSX's track, which the City would then have the right to close, with proper notice, in the event of imminent flooding. It is undisputed that neither the City nor the Drainage District ever built the earthen dike, which CSX correctly describes as the lynchpin of the TPA. Though they may be disfavored, under North Carolina law parties are free to "agree to any condition precedent, the performance of which is mandatory before they become bound by the contract." *Cox v. Funk*, 42 N.C. App. 32, 34–35 (1979); *see also Farmers Bank, Pilot Mountain v. Michael T. Brown Distributors, Inc.*, 307 N.C. 342, 350 (1983). A plain reading of the TPA reveals that the construction of the dike is part of the purpose of the TPA – that is, the TPA granted a license to build a dike, which the City could then close under certain conditions. The language of the TPA is clear and unequivocal and must therefore be enforced as written. *Fairview Devs., Inc. v. Miller*, 187 N.C. App. 168, 171 (2007)

9

(quoting *Woods v. Nationwide Mut. Ins. Co.*, 295 N.C. 500, 506 (1978)). In the absence of an earthen dike, plaintiffs cannot show that CSX has breached the TPA.

Plaintiffs' arguments regarding waiver are unpersuasive. That CSX may have allowed sandbags to be placed across the tracks at some point in the past does not amount to "the intentional relinquishment of a known right." *Disc. Auto Mart, Inc. v. Bank of N. Carolina*, 45 N.C. App. 543, 544 (1980). There is no evidence that CSX expressly waived any right under the TPA, and implied waiver of a right is not looked upon favorably. *Fairview Devs.*, 187 N.C. App. at 173. Accordingly, summary judgment is appropriate on this ground as well.

In sum, plaintiffs' claim is impliedly preempted by ICCTA. Alternatively, plaintiffs have failed to create a genuine issue of material fact as to whether they are third-party beneficiaries who have standing to bring a claim for breach of contract. And finally, even if plaintiffs' contract claim is not preempted and they have standing to bring it, it fails because the City and the Drainage District never fulfilled a condition precedent, and thus CSX has not breached the TPA.

## CONCLUSION

Accordingly, for the foregoing reasons, defendant's motion for summary judgment [DE 125] is GRANTED. Plaintiffs' motion to certify class [DE 129] is therefore DENIED AS MOOT. The clerk is DIRECTED to enter this order in both of the above-captioned cases, enter judgment in favor of defendant, and close the cases.

SO ORDERED, this **27** day of July 2023.

*Terrence W. Boyle*
TERRENCE W. BOYLE
UNITED STATES DISTRICT JUDGE